# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

HANNAH HAYES,

           Plaintiff,

vs.

DEERE & COMPANY, d/b/a John Deere Company,

           Defendant.

No. C21-2051-LTS-KEM

**MEMORANDUM OPINION AND ORDER**

## I.     INTRODUCTION

This case is before me on cross-motions for summary judgment and a motion for sanctions by plaintiff Hannah Hayes. Defendant Deere & Company (Deere) has filed a motion (Doc. 37) for summary judgment as to all counts, to which Hayes has filed a resistance (Doc. 49) and Deere has filed a reply (Doc. 58). Hayes has filed a motion (Doc. 39) for summary judgment on Count III – Coworker Hostile Work Environment, to which Deere has filed a resistance (Doc. 56) and Hayes has filed a reply (Doc. 59) to Deere's statement of additional facts. Hayes has also filed a motion (Doc. 60) for sanctions against Deere pursuant to Federal Rule of Civil Procedure 37. Deere has filed a resistance (Doc. 61) and Hayes has filed a reply (Doc. 62). Oral argument is not necessary. *See* Local Rule 7(c).

## II.     PROCEDURAL HISTORY

On October 7, 2021, Hayes commenced an action against Deere in the Iowa District Court for Black Hawk County. Doc. 3. On October 13, 2021, Deere removed the case to this court based on diversity jurisdiction under 28 U.S.C. § 1332. *See* Doc. 1. Hayes asserts violations of the Iowa Civil Rights Act (ICRA) based on supervisor

sexual harassment (Count I), supervisor hostile work environment (Count II), coworker hostile work environment (Count III) and constructive discharge due to a hostile work environment (Count IV).

Deere has filed a second amended answer (Doc. 24) denying the claims and asserting various affirmative and additional defenses. The parties agreed to a scheduling order and discovery plan (Doc. 17) under which discovery was due by November 1, 2022, a deadline that was later extended to December 12, 2022. *See* Doc. 29. The parties timely filed their motions for summary judgment.

## III. *SUMMARY JUDGMENT STANDARDS*

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475

U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996). On cross motions for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998).

## IV.    RELEVANT FACTS[1]

The following facts are undisputed unless otherwise noted.[2]  Hayes began her employment at Deere on November 14, 2011.  Doc. 49-2 at 4.  She worked at the Waterloo Foundry facility, which is a Union facility with members from the United Autoworkers Union.  *Id.* at 1-2.  On March 22, 2020, she submitted a note from her therapist recommending that she be transferred to second shift to improve her mental health treatment for depression, anxiety and post-traumatic stress disorder (PTSD).  *Id.* at 4-5.  Deere moved Hayes to second shift starting April 8, 2020.  Because Hayes' department did not have a second shift, Deere transferred her to an open position in the MELT department (MELT).  *Id.* at 6.  The grade four wages Hayes received in MELT were the highest she had earned while working for Deere.  Doc. 56-3 at 2.

There are approximately 15 employees on second shift in MELT who are divided into two roles: furnace operator and crane operator.  Doc. 49-2 at 2.  MELT is a dangerous department that involves using a magnet to place raw steel on a pan, which is then placed into the furnace and melted at up to 2,850 degrees Fahrenheit.  *Id.* at 3.  It is then checked and tapped out into a ladle where a crane operator picks it up and stores

---

[1] Because the parties rely on many of the same facts for their motion and resistance to the other party's motion, I will discuss the facts collectively in this section while bearing in mind each party's respective burden in the analysis.

[2] Deere failed to follow Local Rule 56 with respect to filing its responses to Hayes' statement of additional facts.  Those responses should have been submitted with Deere's reply.  *See* Local Rule 56(d).  Instead, they were submitted with Deere's resistance (Doc. 56) to Hayes' motion for summary judgment.  *See* Doc. 56-4.  Deere then added to the confusion by repeating only some of the additional statements of fact and by repeatedly cross-referencing to its response to Hayes' statement of facts in support of her motion for summary judgment.  This means that instead of reading one document, the court had to ping-pong between multiple documents to discern the contents of Hayes' additional statements of fact and Deere's position as to each such statement of fact.

it in a holder furnace.  *Id.* at 2-3.

Upon joining MELT, employees are trained for up to eight weeks.  *Id.* at 3.  In order to qualify as a permanent MELT employee, an employee must pass the training period and receive the requisite certification.  The parties have some disputes about how an employee becomes qualified and receives his or her certification.  Deere asserts that at the end of training, a trainer signs off on the trainee.  Hayes asserts that a trainer <u>must</u> sign off on the trainee's certification.  The supervisor will speak with the trainer and the trainee and walk through the qualification, which involves a series of job tasks.  If the trainer refuses to sign off, the supervisor will ask why and identify the specific items for which sign off is refused and assign the trainee to the supervisor or another trainer, according to Deere, or to "a different trainer or the same trainer," according to Hayes.[3] While Deere maintains that the disqualification process is not solely based on feedback from trainers, Hayes cites Nathan Roedema's deposition testimony that "if the trainer won't feel comfortable, then I'm probably not comfortable.  If I'm not comfortable, then I'm not going to sign off on it."  *Id.* at 4.

Hayes started training in MELT on April 8, 2020.  At that time, she was the only female employee in the department.  She was initially assigned to train with Joe Foster. Foster trained Hayes between April 8 and May 22, 2020.  *Id.*  Foster was loud and short-tempered from Hayes' first day in MELT.  After four and a half days in her new position, Hayes was off work from April 16 through April 29 due to COVID-19.  When she returned, Foster began teaching her how to run the furnace.  He yelled at her for not listening.  *Id.* at 10.  In early May, Hayes was off work due to medical issues.  *Id.* at 10-11.  At some point in May 2020, she and Foster began exchanging text messages that were personal in nature.  Hayes alleges Foster asked her to send naked pictures to him but she did not keep any of these text messages.  *Id.*  Hayes admits that she and Foster had "flirted a little bit . . . because at times, he could be funny."  *Id.* at 11.  Hayes states

---

[3] Citing deposition testimony from Nathan Roedema, Hayes' supervisor.  Doc. 49-2 at 4.

5

that during her training, Foster said he was going to enjoy working with Hayes because of her "nice tits and ass." *Id.* Hayes asserts that Foster told her everyone else in MELT wanted her to fail, but he would make sure she passed her training period because he had a "soft spot" for her. Doc. 56-3 at 7-13. She also asserts that Foster assured her he would make sure she passed her training period so she would receive grade four wages. *Id.*

Hayes returned to work on May 11, 2020, and trained with Foster. On May 12, 2020, Foster was training Hayes when he put his hand down her pants. Doc. 49-2 at 11; Doc. 56-3 at 11. Hayes asserts this was not consensual, that she told Foster he should not do that and backed away. In response, she states Foster grabbed and tried to kiss her. Again, she told him he should not do that and backed away. Doc. 56-3 at 7-13.[4] At some unspecified time, Hayes states Foster brought her to a non-operating department and told Hayes to pull her pants down so they could have sexual intercourse. When Hayes said no, Foster called her a chicken and stormed off. He requested sexual favors from Hayes in exchange for her to pass her training period and pressured her into having oral sex with him in exchange for job benefits, including passing her training period in MELT. Doc. 56-3 at 7-13.[5]

On May 13, 2020, Hayes and Foster met outside of work, with Foster picking Hayes up in his car. Doc. 49-2 at 13. They talked and Hayes decided to get a hotel

---

[4] In response to Hayes' statements about interactions between her and Foster between April 8, May 15, 2020, Deere argues Hayes relies on inadmissible hearsay evidence. It also cites its own statement of facts outlining details that Hayes and Foster had a consensual sexual relationship after this interaction, which she broke off the next day and admitted that Foster never discussed anything sexual with her again. *Id.* Further, it cites Hayes' statement that she and Foster "were both over the sexual encounter and only referenced it in the facts as background to the concern" when she was asked whether the sexual relationship was a driving force for the issues with Foster that she eventually reported on May 26, 2020. *Id.* Deere relies on some of these facts (stated as allegations by Hayes), for purposes of its own motion for summary judgment. *See* Doc. 49-2 at 11-12.

[5] Deere objects to and denies these facts and argues Hayes cannot rely on Foster's invocation of his Fifth Amendment privilege to support these facts. Doc. 56-3 at 11-13.

rather than drive back to her home. At the hotel, Hayes and Foster kissed, removed their clothes and engaged in oral sex. Foster performed oral sex first and she then reciprocated on him. *Id.* Hayes admits the oral sex was voluntary to the extent Foster did not physically force her to engage in oral sex. However, she testified that she felt obligated to engage in oral sex to prevent the situation with Foster from getting worse at work, to pass her training period and to ultimately keep her job at Deere. *Id.*; *see also* Doc. 49-3 at 7, Doc. 56-4 at 4, Doc. 56-3 at 15-17 (in which Hayes asserts: (a) from May 12 to 15, 2020, Foster requested oral sex from Hayes in exchange for passing her training period, earning grade four wages and keeping her job, (b) that after she declined Foster's sexual advances Foster told Roedema that Hayes should not pass her training period and (c) she performed oral sex on Foster in exchange for passing her training period and keeping her job). They spent the night together in the hotel room and Hayes paid for the room. Doc. 49-2 at 13. The next day, on May 14, 2020, Hayes told Foster she did not want to have a physical relationship with him and Foster did not solicit Hayes for anything sexual again. *Id.* at 18.

Hayes alleges that after she told Foster she would not have further physical relations with him he threatened her with physical violence, retaliated against her, told her that his "boys" in MELT would back him up, that Hayes would be disqualified from MELT and that he would have her job terminated with Deere. Doc. 49-3 at 8. Foster also purportedly told Roedema that Hayes should not pass her training period and should be disqualified because she would not give into his sexual advances and requests. *Id.* at 8-9. According to Hayes, Foster advised other MELT employees to retaliate against Hayes. *Id.* Deere denies each of these statements, arguing that they either rely on inadmissible hearsay evidence, Foster's invocation of his Fifth Amendment privilege or contain argument. *See* Doc. 56-4 at 5; Doc. 56-3 at 17-20.

On May 22, 2020, while Foster was training Hayes, they were checking the temperature by lowering a pole into melted iron and Hayes' leather glove began smoking

due to the fire and melt coming down on her. Foster yelled at Hayes during this incident.[6] Another employee witnessed this incident. Hayes then asked Roedema to be paired with a different trainer.[7] Doc. 49-2 at 14. Roedema sent himself an email that day documenting the events which stated:

> Hannah and Joe were taking temp on B2. Had to take a temp 4 times before a good temp was registered. It is difficult for her to temp B furnaces due to her size. Hannah kept grabbing the scalded part of the temp rod and Joe kept telling her not to grab that area of the rod because it will burn her, after showing not to do that the night before. She did it at least 3 times. Her glove was smoldering per Joe. Pertaining to her safety Joe was raising his voice telling her that she needs to start retaining what she is taught so she doesn't get hurt. Joe also says that she just isn't always focusing on what is being taught and is needing shown multiple times on different days. Hannah came up to me shaking and crying saying she cant work with Joe. I put her on a clean up job the rest of the night.
>
> She said Joe is not allowed to yell at her because it makes her nervous. Joe had to yell at her to get her to pay attention and it is going to get her hurt and Joe doesn't want that on his conscious [sic].
>
> Andy Despard comments about training:
> Not safety aware
> Loss of attention
> Doesn't follow directions well
> Handsy/Verbal

---

[6] Hayes asserts that Foster became upset with Hayes and would yell at her after she had declined his sexual advances, Doc. 56-3 at 13-14, but also admitted that Foster was loud and short-tempered with her from her first day in MELT. Doc. 49-2 at 9.

[7] The parties dispute the reason Hayes asked Roedema if she could train with a different trainer. Hayes asserts it was based on the May 12, 2020, incident of Foster sticking his hand down her pants and trying to kiss her. Deere asserts it was based on the incident involving Hayes touching a hot surface and Foster yelling at her. Docs. 49-2 at 14-15; 56-3 at 13.

8

*Id.* at 15.  At Hayes' request, Roedema paired her to train with Andy Despard.[8]

On May 25, 2020, Hayes was off work for the Memorial Day holiday, and emailed a two-week notice to Mike Marquart, an employee in Labor Relations.  The next day, still on vacation, she emailed Marquart again, stating she was "rethinking" her notice and that "I just don't want to quit because of an argument with a co-worker."  *Id.* at 16.  That same day she also called Deere's Compliance Hotline and made a formal complaint of "Discrimination or Harassment: Workplace Harassment" and "Threats and Physical Violence" against Foster, stating: "

> On May 22, 2020, Joe [Foster] threatened Hannah [Hayes] by making her job at the site miserable.  Hannah notes that she had a sexual relationship with Joe [Foster] for a few days, but she declined to see him anymore.  The situation made Joe hostile since he started to accuse Hannah of lying to other coworkers.  Joe stated to Hannah that no employee would take her side, promising Hannah that he would make sure she would not have a job position in the future.  The situation was reported to a supervisor (name withheld).  Hannah does not feel in danger at the moment of the call, but she feels that she would be set up to fail at the site cause of Joe.  Hannah wants the company to take appropriate actions to resolve this ongoing issue.

*Id.* at 17.

On May 28, 2020, Marquart interviewed Hayes.  He does not recall whether he knew the details of Hayes' formal complaint at this time.  Hayes was provided Marquart's notes, Doc. 38-3 at 78, during her deposition and she testified they were accurate but incomplete because they did not reflect everything discussed.  Doc. 49-2 at 17.  During her interview, Marquart discussed the disqualification process and explained that it is not based solely on feedback from trainers.  *Id.* at 18.  Marquart told her that "facts and

---

[8] Hayes states Roedema told her she needed to continue to train with Foster, Doc. 56-3 at 13, but admits that she was moved to training with Despard.  Doc. 49-2 at 16.  Hayes also asserts that between the end of April 2020 and May 22, 2020, she asked Roedema approximately 15 times if she could transfer to a trainer other than Foster.  *See* Doc. 49-3 at 8.  Deere denies and objects to this statement of fact as relying on self-serving testimony.  *See* Doc. 56-4 at 5.

documentation were a larger factor so long as she was performing well and continuing her training, Mr. Foster would not be able to run her out of the department." *Id.* The parties dispute whether Marquart interviewed Foster but agree that Marquart scheduled a meeting with Foster on June 3, 2020. They also agree that following his meeting with Foster, Marquart did nothing further to investigate Hayes' complaints against Foster. They dispute whether Hayes' formal complaints against Foster of harassment and threats of physical violence were investigated.[9]

On June 2, 2020, Hayes states she reported to Deere's medical department that an employee kissed her at work and threatened her. Doc. 49-3 at 10. Deere argues this statement is inadmissible hearsay and further, Hayes had a different issue with someone allegedly threatening her and necessitating a request for security, so there is no way to ascertain to which incident this hearsay refers.[10] *See* Doc. 56-4 at 6; Doc. 56-3 at 23.

Hayes states that after she reported Foster to Roedema and Deere's Compliance Hotline, Foster and his "boys" in the department, including Despard and Clark, started to tell Roedema that Hayes was doing a poor job on her training, and should not pass, and also made fun of Hayes over the radio.[11] Doc. 49-3 at 12. After the May 22, 2020, incident, Hayes returned to work on June 3, 2020. She states she was fearful of Foster and the other MELT employees and feared not passing her training period and losing her job at Deere. Docs. 49-3 at 13; 56-4 at 8; 56-3 at 25. Deere notes, and Hayes admits,

---

[9] Deere objects, asserting that Hayes relies on inadmissible hearsay opinions contained in her expert report (Doc. 39-3 at 99), and cites an investigation that Deere had performed by attorney Judith Hermann after Hayes resigned via letter in July 2020. *See* Docs. 49-3 at 11, 56-4 at 6, 56-3 at 24, 59 at 2-5. That investigation and the Investigation Report are the subject of Hayes' motion for sanctions.

[10] It appears this report to medical personnel was referring to the May 12, 2020 incident with Foster because according to Deere, her other issue with someone threatening her and requiring security involved someone outside of work. *See* Doc. 59 at 2. Hayes does not allege that anyone other than Foster engaged in inappropriate physical touching.

[11] Deere argues this is a self-serving statement and inadmissible hearsay. Doc. 56-4 at 8.

10

that Marquart had explained to her "that facts and documentation were a larger factor" in her training "so as long as she was performing well and continuing her training, Mr. Foster would not be able to run her out of the department." Doc. 49-2 at 18.

Marquart also instructed Hayes to report any concerns to her supervisor and reiterated Deere's anti-retaliation policy during their meeting. *Id.* The parties dispute whether Marquart instructed and required Roedema to start completing an "observation report log" for Hayes at this point. Docs. 49-3 at 11; 56-4 at 6; 56-3 at 25. Hayes had a meeting with the Union to discuss expectations regarding safety, quality and production and that if Hayes was in a situation regarding safety, then it was everyone's responsibility to get out of harm's way. *Id.* at 19. At this meeting, she was reminded to be careful when taking the temperature of the iron. *Id.* Roedema stated this meeting was scheduled because he "had questions about her retaining information and working safely around molten iron." *Id.*

Two days later, on June 5, 2020, Hayes overfilled 5,000 to 8,000 pounds in a furnace, causing iron to spill onto the transfer car and floor melting the outside of the lower ladle. Hayes states that another employee was also responsible for this incident. The iron spill occurred while Hayes was in a state of shock – her coworker repeated instructions twice and the ladle started overflowing causing him to tell her to get out of the way. Hayes was frozen and did not move. She attributes this incident to her fear of Foster and his "boys," not passing her training period and losing her job. Doc. 49-3 at 13. Roedema had to write a "near miss report." Hayes missed the next full week of work for depression-related issues. She returned to work on June 15, 2020.

On June 16, 2020, Hayes was warming furnaces without a trainer and Despard called her out on the radio, telling her to stop until a trainer was near. On June 18, 2020, Hayes was warming up furnaces to 2,450 degrees and was at 2,449 degrees when Clark, believing she was not paying attention, asked her how hot she was planning to get the furnace since it was over 2,450 degrees. This was the last day Hayes physically worked in MELT.

11

On June 19, 2020, Hayes reported to the Union she was not feeling safe in MELT and requested a transfer to a different department. She was not transferred. Doc. 56-3 at 26. On June 22, 2020, she reported a "workplace assault" to Katie Bries, ARNP.[12] On July 22, 2020, Hayes submitted her resignation letter to Deere, stating it was "due to employee retaliation, verbal threats and abuse, discrimination, sexual harassment" and detailed her experiences working in MELT. Doc. 38-5 at 29. Hayes asserts Deere did not investigate any of the statements or allegations she made on June 2, 2020, June 19, 2020, June 22, 2020, or in her resignation letter. Deere denies this, citing a letter dated September 16, 2020, from David Dunn, Deere's Waterloo Works Safety Manager stating:

> We have conducted an investigation and interviewed all employees in your department on second shift. The investigation has determined that you were treated fairly, not discriminated against nor harassed nor sexually touched or harassed, nor were any unwanted sexual advances made. The investigation did not reveal you were treated any differently than a male in the department.

Docs. 49-3 at 14; 56-4 at 8-9; 56-3 at 27.

Deere admits that Dunn had no information or knowledge regarding Hayes' complaints against Foster and regarding MELT. The parties dispute whether the investigation and conclusions were fabricated.[13] Deere states that Dunn testified he signed the letter and that the letter was drafted by counsel. *Id.* It cites an Investigation Report authored by attorney Judith Hermann, who was hired to investigate after Deere received Hayes' resignation letter on July 22, 2020. Doc. 59 at 2-5. Hayes stated in her letter she was resigning due to the treatment from Foster. She did not formally resign, however, until August 6, 2020. Doc. 49-2 at 21.

---

[12] This is documented in a Weekly Indemnity Disability Application signed by ARNP Bries. Doc. 39-3 at 23.

[13] This will be discussed further in Section V(C).

On June 29, 2020, Hayes filed a petition for workers' compensation benefits with a date of injury of May 12, 2020, describing her workplace injury as "unwanted physical touching by another John Deere employee; repeated, unwanted sexual advance and explicit statements by another John Deere employee; continuously pressured & intimidated by another John Deere employee; singled-out, harassed, & discriminated against or being a female in Claimant's John Deere department." *Id.* On January 25, 2021, Hayes reported Foster to the Waterloo Police Department for sexual assault due to the allegation that he put his hand down her pants at work the previous May. *Id.* at 22.

On February 4, 2021, Hayes filed a harassment complaint with the Iowa Civil Rights Commission (ICRC) alleging in part:

> I, Hannah Lee Hayes was discriminated against my [sic] mental health conditions, I was sexualy harrasment [sic] because I am a female. I was sexualy harrasment [sic] by employee that stuck his hands down my pants. I was discriminated because I told the truth. I was discriminated because of my learning disability after years of trauma. I was harrasment [sic] by my supervisor Nathan Rodema [sic] stating the guys don't think a girl can make it. I got so nervous I spilt [sic] iron. I could have caused a major accident. I was sent back to the environment from my LR department and they told me to let someone else hit him for running his mouth. Joe Foster that is. I was terrified after telling the truth they would go after me. I stayed in my home for weeks afraid to go outside because of JD workers living there. I resigned do [sic] to being sent back to a violent environment after I was threatened and made fun of. No man or women should go through this.

*Id.* at 22. Hayes denies that the same individuals who are alleged to have injured Hayes with regard to her workers' compensation claim are the same individuals who are alleged to have engaged in the sexual harassment, discrimination and retaliation against her. *Id.* She also denies it is the same conduct. Hayes was not represented by counsel in the ICRC matter until March 3, 2021.

On February 10, 2022, Hayes, represented by counsel, and Deere entered into a compromise workers' compensation settlement stating:

In consideration of this payment, Claimant [Ms. Hayes] . . . releases and discharges the above Employer from liability under the Iowa Workers' Compensation Law only. The payment of $75,000.00 is acceptable to Claimant as a full and final compromise settlement, satisfaction, and final discharge of her claims against Defendant herein under the Workers' Compensation Law, only, for asserted injuries sustained by Claimant on or about May 12, 2020. The parties agree that the compromise settlement does not release, relinquish, or in any way discharge any other claims that exist against Defendant and any of its employees by reason of Claimant's employment through Defendant.

This settlement agreement in no way extinguishes Claimant's private causes of action currently pending in Federal District Court.

Doc. 38-4 at 25.

## V. DISCUSSION

### A. Deere's Motion for Summary Judgment

Deere argues it is entitled to summary judgment on four grounds: (1) Hayes' prior workers' compensation recovery bars her ICRA claims, (2) she cannot succeed on her supervisor sexual harassment or hostile work environment claims because Foster was not her supervisor, and (3) she cannot succeed on her coworker hostile work environment claim because the alleged conduct does not rise to the level of unlawful harassment and (4) she cannot establish her claim of constructive discharge. I will discuss each in turn.

#### 1. Effect of Workers' Compensation Settlement

Deere argues that (a) recovery on any of Hayes' ICRA claims is barred by the election of remedies doctrine based on her previous workers' compensation claim and (b) that Hayes' acceptance of a workers' compensation settlement deprives the court of jurisdiction over her claims. Hayes argues that the parties' settlement agreement for her workers' compensation claim expressly reserves her right to pursue the ICRA claims.

14

"Election of remedies is an equitable defense." *State v. Halverson*, 362 N.W.2d 501, 503 (Iowa 1985). The election of remedies doctrine "is designed to prevent double recovery for a single injury, not to prevent recourse to alternative remedies." *Whalen v. Connelly*, 621 N.W.2d 681, 685 (Iowa 2000). "The party claiming the application of the doctrine of election of remedies must be able to establish three elements: (1) the existence of two or more remedies, (2) an inconsistency between the remedies, and (3) an intelligent and intentional choice of one of the remedies." *DuTrac Community Credit Union v. Hefel*, 893 N.W.2d 282, 291 (Iowa 2017) (citing *State v. Funke*, 531 N.W.2d 124, 127 (Iowa 1995)). "Remedies are inconsistent . . . if the party against whom the doctrine is asserted has pursued one remedy to the point he adopts a contradictory position in attempting to pursue the other." *Bolinger v. Kiburz*, 270 N.W.2d 603, 606 (Iowa 1978). "Thus, consistent remedies may be pursued concurrently even to final adjudication, but the satisfaction of one claim bars the other one." *Id.* "The doctrine of election of remedies is not favored by the courts" and should not be applied "unless there is evidence of substantial prejudice." *Id.* (citing *Whalen*, 621 N.W.2d at 685-86).

Hayes filed a workers' compensation claim on June 29, 2020, alleging the following injuries: "Physical-mental, mental-mental, PTSD, depression, anxiety, BAW." Doc. 38-3 at 105. She alleged this occurred from: "Unwanted physical touching by another John Deere employee; repeated, unwanted sexual advances and explicit statements by another John Deere employee; continuously pressured & intimidated by another John Deere employee; singled-out, harassed, & discriminated against for being a female in Claimant's John Deere dept." *Id.* On February 4, 2021, Hayes filed a harassment claim with the ICRC, alleging:

> I, Hannah Lee Hayes was discriminated against my [sic] mental health conditions, I was sexualy harrasment [sic] because I am a female. I was sexualy harrasment [sic] by employee that stuck his hands down my pants. I was discriminated because I told the truth. I was discriminated because of my learning disability after years of trauma. I was harrasment [sic] by my supervisor Nathan Rodema [sic] stating the guys don't think a girl can make it. I got so nervous I spilt [sic] iron. I could have caused a major

15

accident. I was sent back to the environment from my LR department and they told me to let someone else hit him for running his mouth. Joe Foster that is. I was terrified after telling the truth they would go after me. I stayed in my home for weeks afraid to go outside because of JD workers living there. I resigned do [sic] to being sent back to a violent environment after I was threatened and made fun of. No man or women should go through this.

Doc. 38-2 at 65. Hayes stated the date of the most recent discriminatory incident was "5/22/2020-Re changed." *Id.* at 61.

Hayes recovered $75,000 from Deere pursuant to a settlement agreement on February 9, 2022.[14] The compromise settlement identifies the date of injury as May 12, 2020. Doc. 38-4 at 23. The agreement provides:

In consideration of this payment, Claimant [Ms. Hayes] . . . releases and discharges the above Employer from liability under the Iowa Workers' Compensation Law only. The payment of $75,000.00 is acceptable to Claimant as a full and final compromise settlement, satisfaction, and final discharge of her claims against Defendant herein under the Workers' Compensation Law, only, for asserted injuries sustained by Claimant on or about May 12, 2020. The parties agree that the compromise settlement does not release, relinquish, or in any way discharge any other claims that exist against Defendant and any of its employees by reason of Claimant's employment through Defendant.

This settlement agreement in no way extinguishes Claimant's private causes of action currently pending in Federal District Court.

Doc. 38-4 at 25. Deere does not address this part of the agreement in its reply, but relies on the argument that Hayes' pursuit of ICRA claims is barred by the exclusivity provision of the Iowa Workers' Compensation Act. *See* Iowa Code § 85.20 ("The rights and remedies provided in this chapter . . . for an employee . . . on account of injury . . . for which benefits under this chapter . . . are recoverable, shall be the exclusive and only

---

[14] Deere states in its brief that Hayes' workers' compensation claim was settled on January 31, 2021, but the agreement shows that both parties signed it in 2022. *See* Doc. 38-4 at 25.

rights and remedies of the employee . . . on account of such injury, . . . against . . . the employee's employer.").

Generally, an injured worker's acceptance of workers' compensation benefits is the exclusive means of recovery and represents an election of remedies that bars the right to sue the employer in another forum. *See Subcliff v. Brandt Engineered Prods., Ltd.*, 459 F. Supp. 2d 843, 850 (S.D. Iowa 2006) ("When an employer's workers' compensation liability is insured and benefits are recoverable, an action for workers' compensation benefits is the exclusive remedy available to an employee against an employer for work-related injury."); *Ottumwa Housing Auth. v. State Farm Fire & Casualty Co.*, 495 N.W.2d 723, 725 (Iowa 1993) ("[an] employer's immunity is the quid pro quo by which the employer gives up his normal defenses and assumes automatic liability, while the employee gives up his right to common law verdicts." (quoting *Suckow v. NEOWA FS, Inc.*, 445 N.W.2d 776, 779 (Iowa 1989))). However, the parties are free to contract out of the exclusivity provision. *See Heck v. George A. Hormel Co.*, 260 N.W.2d 421, 423 (Iowa 1977) ("The fact that an employee's rights against an employer for industrial accidents lie exclusively within the provisions of Chapter 85 does not prevent the parties from agreeing by contract to augment the benefits there conferred.").

The parties' compromise settlement is unambiguous that Hayes was releasing her claims against Deere "under the Workers' Compensation Law only" and explicitly reserved the right to continue pursuing her pending federal claims. *See* Doc. 38-4 at 25 ("This settlement agreement in no way extinguishes Claimant's private causes of action currently pending in Federal District Court."). By entering into this agreement, Deere waived any defense based on exclusivity or election of remedies. As such, it is not entitled to summary judgment on this basis.

### 2. Supervisor Sexual Harassment and Hostile Work Environment – Counts I and II

Deere argues Hayes cannot succeed on her supervisor sexual harassment (Count I) or hostile work environment (Count II) claims because Foster was not her supervisor. Deere states it is undisputed that Foster never had the authority to hire, fire, promote, demote, adjust pay or benefits or discipline Hayes in any way. Hayes has admitted her MELT supervisor was Roedema. Deere contends Foster was merely a trainer and assigned to show Hayes how to safely perform her job duties until she was deemed qualified to conduct them on her own. While Hayes required the approval of Roedema and at least one trainer to become qualified, Deere states that no single trainer had the power to prevent Hayes from becoming qualified. The only consequence of failing to complete her initial training would be to be paired with another trainer or Roedema to try again. Deere argues the record lacks any evidence that Foster could have a material impact on Hayes' employment as required to be considered a supervisor and for Deere to be liable under Counts I and II.

Hayes argues a reasonable jury could find that Foster was Hayes' supervisor because there is a genuine issue of material fact as to whether Foster had the power (not necessarily exercised) to take tangible employment action against Hayes. She states that Foster determined if she passed her training period because Roedema testified that if Hayes' trainer was not comfortable signing off on her certification, then he would also not be comfortable and that, in the event Hayes did not pass her training period and receive the requisite certification, she would be disqualified from MELT and would lose the highest earning wages she had ever earned while working at Deere.

While the Iowa Supreme Court has not adopted a definition of "supervisor" under the ICRA, the United States Supreme Court has addressed the matter and Iowa courts frequently rely on federal law for guidance concerning ICRA claims. *See Boyle v. Alum-*

18

*Line, Inc.*, 710 N.W.2d 741, 748 (Iowa 2006). The Supreme Court has held that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim . . . ." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). Tangible employment actions effect "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 431. The Court specifically rejected the approach recommended by the EEOC Guidance, which tied supervisor status to the ability to exercise significant direction over another's daily work. *Id.*

Hayes has not demonstrated a genuine issue of material fact that Foster was empowered by Deere to take tangible employment actions against her. Hayes' argument that Foster was in control of her day-to-day job duties relies on a definition of supervisor that was rejected in *Vance*. It is also immaterial that Foster said things to Hayes that made her think he was responsible for making sure she passed her training period, particularly because Hayes admits she was told otherwise by Marquart. *See* Doc. 49-2 at 18 (admitting that Marquart explained the disqualification process and that it is not solely based on the feedback from trainers but that "facts and documentation were a larger factor so as long as she was performing well and continuing her training, Foster would not be able to run her out of the department.").

Hayes' other arguments are related to Foster's role in Hayes' passing her training period and receiving her certification in order to continue working in MELT. While the parties dispute the extent to which Foster played a role in Hayes obtaining her certification, it is undisputed that to become qualified, Roedema had to sign off on her certification, not just Foster. *See* Doc. 49-2 at 4 (in responding to the statement that the disqualification process is not based solely on feedback from trainers, Hayes qualifies the statement by citing Roedema's testimony that "if the trainer won't feel comfortable, then I'm probably not comfortable. If I'm not comfortable, then I'm not going to sign off on it."). While Roedema generally testified he would not be comfortable signing off on a

19

certification if the trainer was not comfortable, he did not testify he would not have signed off on Hayes' certification if Foster was not comfortable. In other words, Roedema remained the final decisionmaker and did not state that he would have simply rubber-stamped Foster's conclusion.

Viewing the facts in the light most favorable to Hayes, she has shown, at most, that Foster could influence Roedema (Hayes' admitted supervisor), *see* Doc. 49-2 at 6, to take tangible employment action against Hayes. This is not sufficient to make Foster a "supervisor" under *Vance*. *See E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 685 (8th Cir. 2012) ("a coworker's authority to make mere *recommendations* or evaluations to a superior about tangible employment decisions pertaining to a fellow employee does not constructively promote that coworker to a supervisor for purposes of vicarious Title VII liability.") (emphasis in original);[15] *EEOC v. AutoZone, Inc.*, 692 F. App'x 280 (6th Cir. 2017) (concluding store manager was not a supervisor even though he could initiate the disciplinary process and recommend demotion and promotion because only the district manager could fire, demote, promote or transfer employees). Deere is entitled to summary judgment on Counts I and II based on supervisor sexual harassment and hostile work environment.

### 3. *Coworker Hostile Work Environment – Count III*

Deere argues that Hayes' hostile work environment claim based on sexual harassment by a coworker (Count III) fails because she cannot demonstrate the alleged harassment negatively affected a term, condition, or privilege of employment. Specifically, it notes that she cannot demonstrate ongoing, repeated conduct that rises to the standard necessary to support a hostile work environment claim.

---

[15] The *Vance* Court acknowledged that the standard it adopted had been the law for quite some time in the Eighth Circuit. *See Vance*, 570 U.S. at 449 (citing *Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1057 (8th Cir. 2004)).

Hayes argues that under Eighth Circuit precedent, a single incident can be sufficiently severe to amount to a hostile work environment. *See* Doc. 49-1 at 26-27 (citing cases). She asserts that Foster's undisputed nonconsensual, sexual touching of Hayes and forcible attempt to kiss her on May 12, 2020, is akin to conduct that meets this standard and, at the very least, raises a fact issue. Hayes also argues that Foster's conduct extended beyond the May 12, 2020, incident. She states that between April 2020 and May 12, 2020, he requested she exchange sexually explicit photos with him and commented that "he was going to enjoy working with her because of her 'nice tits and ass.'" Doc. 49-2 at 11. Foster also requested that she pull down her pants so they could have sexual intercourse and called her "chicken" and stormed off when she declined. She adds that Foster physically threatened her after she refused to have physical relations with him, he requested and pressured her to engage in oral sex in exchange for passing her training and keeping her job and told her his "boys" would back him up which Hayes interpreted as a threat of physical violence. Doc. 56-3 at 7-13 and 15-17; Doc. 49-3 at 7, Doc. 56-4 at 4.

"A hostile work environment 'arises when sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Vajdl v. Mesabi Academy of Kids Peace, Inc.*, 484 F.3d 546, 550 (8th Cir. 2007). A prima facie claim of hostile work environment under the ICRA includes the following elements: (1) that the plaintiff belonged to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on sex; (4) that it affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take proper remedial action. *Boyle*, 710 N.W.2d 746. Deere seeks summary judgment based only on the fourth element.

Harassment affects a term, condition, or privilege of employment "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . 'sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment.'" *Haskenhoff v. Homeland Energy Solutions, LLC*, 897 N.W.2d 553, 571 (Iowa 2017) (quoting *Farmland Foods, Inc. v. Dubuque Human Rights Commission*, 672 N.W.2d 733, 743 (Iowa 2003)). Factors to be considered include: (1) the conduct's frequency; (2) its severity; (3) whether the conduct was physically threatening or humiliating or merely offense; and (4) whether the conduct unreasonably interfered with job performance. *See Farmland Foods*, 672 N.W.2d at 744. "[H]ostile-work-environment claims by their nature involve ongoing and repeated conduct, not isolated events." *Id.* at 745. However, the Eighth Circuit has recognized that a single incident may constitute a hostile work environment.[16] *See Moring v. Arkansas Dept. of Correction*, 243 F.3d 452, 456 (8th Cir. 2001) ("we are unaware of any rule of law holding that a single incident can never be sufficiently severe to be hostile-work-environment sexual harassment.").

This element requires Hayes to prove that "she 'subjectively perceived the conduct as abusive' and that 'a reasonable person would also find the conduct to be abusive or hostile.'" *Simon Seeding & Sod, Inc.*, 895 N.W.2d at 469 (quoting *Farmland Foods*, 672 N.W.2d at 744). This is a difficult standard to meet. *See McMiller v. Metro*, 738 F.3d 185, 188 (8th Cir. 2013) (conduct was not sufficiently severe or pervasive so as to alter terms and conditions of employment where supervisor kissed employee on two occasions, placed his arms around her or attempted to do so three times and requested that she remove an ingrown hair near his chin); *LeGrand v. Area Res. for Cmty. & Human*

---

[16] Iowa courts have expressed skepticism about whether a single incident could amount to a hostile work environment. *See Lynch v. City of Des Moines*, 454 N.W.2d 827, 832 (Iowa 1990) ("the essence of a sexually hostile work environment claim clearly is that of a pattern of harassment, a violation over time; we doubt that a sexually hostile work environment could be shown by proving only one incident of sexual harassment."). However, the Iowa Supreme Court has generally turned to federal law, including decisions of the Eighth Circuit Court of Appeals, when considering hostile work environment claims under the ICRA. *See, e.g.*, *State v. Watkins*, 914 N.W.2d 827, 843-44 (Iowa 2018). It has acknowledged, based on federal law, that isolated incidents "will not amount to discriminatory changes in the employment conditions to create an abusive work environment," "unless extremely serious." *Id.* at 843.

*Servs.*, 394 F.3d 1098, 1100-03 (8th Cir. 2005) (conduct not sufficiently severe or pervasive where harasser asked plaintiff to watch pornographic movies and masturbate together, suggested he would advance in the company if he caused the harasser to orgasm, kissed him on the mouth, grabbed his buttocks, reached for his genitals and briefly gripped the plaintiff's thigh).

Deere argues the conduct at issue is limited to the May 12, 2020, incident of Foster putting his hand down Hayes' pants. Hayes alleges that Foster's conduct extended beyond that incident but Deere disputes the admissibility of that evidence. *See* Doc. 49-3 at 5-9; Doc. 56-4 at 4-5; Doc. 56-3 at 7-20. According to Hayes, the inappropriate conduct began with Foster telling Hayes he thought he would never see a woman in MELT and that he was going to like working with her because she had a "really nice ass and tits." Doc. 56-3 at 8. Deere objects to and denies these facts based on hearsay under Federal Rule of Evidence 802 and based on the subsequent sexual encounter between Hayes and Foster. It notes that Hayes testified to an out-of-work consensual sexual relationship with Foster that occurred on May 13, 2020, but that she broke it off the following day and Foster never discussed anything sexual with her again. *Id.* Additionally, when Hayes was asked if the sexual relationship was a driving force for her issues with Foster that she reported on May 26, 2020, Hayes stated that "they were both over the sexual encounter and only referenced it in the facts as background to the concern." *Id.* She was later given the opportunity to review a summary that included this statement of "background" and she agreed it was accurate. *Id.*

Deere relies on these same objections as to other conduct identified by Hayes that contributed to a hostile work environment including:

- Foster told Hayes that everyone else in MELT wanted her to fail, but he would make sure she passed her training period because he had a "soft spot for her"
- Foster told Hayes he would pass her so she could become a permanent MELT employee and receive grade four wages
- Foster asked Hayes to exchange sexually explicit pictures with him

23

- After Foster stuck his hand down the back of Hayes' pants and Hayes backed away from him, he grabbed and tried to kiss her
- Foster brought Hayes to a non-operating department and told Hayes to pull her pants down so they could have sexual intercourse. When Hayes said no, Foster called her "chicken" and stormed off.
- Foster requested sexual favors from Hayes in exchange for her to pass the MELT department training period.
- Foster pressured Hayes into having oral sex with him in exchange for job benefits, including passing her training period.

Doc. 49-3 at 5-6; Doc. 56-3 at 8-13.[17] In addition to the above-noted objections in response to these additional statements of fact, Deere notes that Hayes relies, in part, on Foster's invocation of his Fifth Amendment privilege and argues that reliance on such is legally unsupported. At best, it states such evidence involves a credibility determination. *See United States v. $110,000.00 in U.S. Currency*, 601 F. Supp. 3d 476, 485-86 (D. Neb. 2022).

Deere's objections are insufficient to preclude consideration of the evidence offered by Hayes. First, Foster's alleged statements are not hearsay, as they are not offered for the truth of the matter asserted. Second, the nature of Foster and Hayes' sexual encounter outside of work is a factual issue that does not somehow preclude Hayes from offering evidence of Foster's conduct towards her in the workplace. Rather, it raises a credibility issue. Finally, with regard to the argument that Hayes may not rely on evidence that Foster invoked his Fifth Amendment privilege, it is well established that an adverse inference may be drawn from a party's assertion of the Fifth Amendment in a civil case. *See Baxter v. Palmigiano*, 425 U.S. 308, 317-18 (1976). The Eighth Circuit has recognized that such an inference can also be drawn based on a non-party witness' invocation of the privilege. *See Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 521 (8th Cir. 1984).

---

[17] Hayes supports these statements of fact with her deposition testimony, Foster's deposition testimony and her letter of resignation. *See* Doc. 49-3 at 5-6.

Case 6:21-cv-02051-LTS-KEM    Document 63    Filed 04/24/23    Page 24 of 37

However, courts have concluded that an adverse inference based on a Fifth Amendment invocation alone is insufficient evidence to defeat summary judgment. *See Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991) ("The negative inference, if any, to be drawn from the assertion of the fifth amendment does not substitute for evidence needed to meet the burden of production."). The invocation of the Fifth Amendment privilege is considered to be an ambiguous response and a plaintiff must come forward with other evidence to demonstrate a genuine issue of material fact. *See Farace v. Independent Fire Ins. Co.*, 699 F.2d 204, 210-011 (5th Cir. 1983); *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 675 (5th Cir. 1999). Here, Hayes relies on her deposition testimony and her resignation letter in addition to Foster's deposition testimony in which he asserted the Fifth Amendment. *See* Doc. 49-3 at 5-6. This is sufficient evidence to demonstrate a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials").

Hayes alleges additional conduct by Foster and others that contributed to a hostile working environment including that after she told Foster she would not have any further physical relations with him he:

- Threatened her with physical violence
- Retaliated against her
- Told her that his "boys" in MELT would back him up
- Told her he would have her job terminated with Deere
- Told Roedema that Hayes should not pass her training period
- Told Roedema that Hayes should be disqualified because she would not give into his sexual advances and requests

25

- Advised MELT employees to retaliate against Hayes

Doc. 49-3 at 8-9; Doc. 56-4 at 5-6; Doc. 56-3 at 17-20. Deere also objects to these statements of fact based on hearsay and Foster's invocation of his Fifth Amendment privilege. As discussed above, these objections are not sufficient to preclude consideration of this evidence at summary judgment as Hayes also relies on her resignation letter and Marquart's notes from his interview with her in addition to Foster's deposition testimony in which he asserted the Fifth Amendment.

Viewing the evidence in the light most favorable to Hayes, I find a fact question exists as to whether the conduct at issue was sufficiently severe or pervasive that it affected a term, condition or privilege of employment. While Deere characterizes the relevant conduct as the single incident on May 12, 2020, Hayes has submitted admissible evidence from which a reasonable jury could conclude that Foster's inappropriate conduct extended beyond that and taken together, amounted to a hostile work environment. Even if limited to the single May 12, 2020, incident, a jury could find that that incident affected a term, condition or privilege of plaintiff's employment. *See Moring*, 243 F.3d at 456 ("we are unaware of any rule of law holding that a single incident can never be sufficiently severe to be hostile-work-environment sexual harassment."); *Howard v. Burns Bros.*, 149 F.3d 835, 840 (8th Cir. 1998) ("[o]nce there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury."). The May 12, 2020, incident involved Foster reaching down the back of Hayes' pants, grabbing her and trying to kiss her. Even if this was an isolated incident, it was severe and physically threatening or humiliating, and within the range of conduct to meet the threshold of a sexual harassment claim based on hostile work environment. *See Rorie v. UPS, Inc.*, 151 F.3d 757, 762 (8th Cir. 1998) ("While we concede that the facts of this case are on the borderline of those sufficient to support a claim of sexual harassment, we cannot say that a supervisor who pats a female employee on the back, brushes up against her, and tells her that she smells good does not

26

constitute sexual harassment as a matter of law."); *Pierce v. Rainbow Foods Group*, 158 F. Supp. 2d 969, 973 (D. Minn. 2001) (single incident in which employee found plaintiff alone, limited her ability to leave the area, and forcibly kissed and touched her in an intimate manner was sufficient for a reasonable jury to conclude that plaintiff was sexually harassed on the basis of this incident alone).   As one court has explained:

> the line of demarcation which separates 'isolated incidents' of harassment from the purview of Title VII, must be drawn around actual sexual assaults, involving the unwanted touching or groping of a victim's intimate body parts.  A single sexual assault has a far greater potential to adversely alter the work environment, and with greater permanence, than would an offensive verbal remark, or a series of such remarks.  Therefore, although the period of harassing conduct in this case was short-lived, the three sexual assaults were sufficiently offensive, and so dominantly repugnant to raise a genuine issue of fact as to whether the harassment was sufficiently severe to be actionable under a hostile environment theory.

*Grozdanich v. Leisure Hills Health Center, Inc.*, 25 F. Supp. 2d 953, 970 (D. Minn. 1998).

Hayes' additional evidence of Foster's conduct before and after this incident, including taking Hayes to a non-operating department and telling her to pull down her pants so they could have sexual intercourse, requesting sexual favors from her in exchange for passing her training and subsequent threats, further supports a conclusion that there are fact issues for a jury to resolve.  Additionally, while Deere's objections to Hayes' evidence were insufficient to preclude consideration of the evidence offered by Hayes, those objections highlight that there are significant credibility issues at play.  As such, a jury should determine the extent of the conduct at issue and whether it was so severe or pervasive that it affected a term, condition or privilege of Hayes' employment.

For these reasons, Deere's motion for summary judgment on Hayes' hostile work environment claim based on coworker sexual harassment (Count III) is denied.

## 4.    *Constructive Discharge – Count IV*

Deere argues Hayes cannot establish a claim of constructive discharge because she has not demonstrated a genuine issue of material fact that the workplace conditions were "extraordinary or egregious" or that she experienced a "continuous pattern" of intolerable conduct.  It contends the isolated May 12, 2020, incident is insufficient to support a claim of constructive discharge for the same reasons it cannot constitute a hostile work environment.

Hayes argues that her basis for constructive discharge extends beyond the May 12, 2020 incident as discussed previously.  She asserts that Deere did not take any action despite her multiple reports of Foster's behavior, that she did not feel safe and she wanted to transfer to another department.  She contends that based on the evidence she has put forth regarding Foster's conduct and Deere's response, a reasonable jury could find she was constructively discharged.

"Constructive discharge exists when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Van Meter Indus. v. Mason City Human Rights Comm'n*, 675 N.W.2d 503, 511 (Iowa 2004).  "The test for constructive discharge is objective, evaluating whether a reasonable person in the employee's position would have been compelled to resign and whether an employee reasonably believed that there was no possibility that an employer would respond fairly." *Haskenhoff*, 897 NW.2d at 592. "An employee cannot simply 'quit and sue,' claiming he or she was constructively discharged . . . . The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." *Haberer v. Woodbury Cnty.*, 560 N.W.2d 571. 575 (Iowa 1997).

For the same reasons described above with regard to Hayes' hostile work environment claim, I find that she has provided sufficient evidence of "extraordinary or egregious" workplace conditions that could support a constructive discharge claim.

Because this is the only basis on which Deere seeks summary judgment, its motion is denied as to Hayes' constructive discharge claim (Count IV).

## B.    *Hayes' Motion for Summary Judgment on Count III*

Hayes seeks summary judgment on Count III, alleging hostile work environment under the ICRA based on coworker sexual harassment.  Deere asserts Hayes cannot meet the high standard set in hostile work environment cases because: (1) the May 12, 2020, incident falls short of the standard, (2) the first time she complained about working with Foster, she was given a new trainer and (3) in her compliance report filed thereafter, she stated the harassment occurred one time and referenced only the incident in which Foster yelled at her.   Additionally, during her meeting with Marquart, Hayes explicitly disclaimed that her prior sexual relationship with Foster was connected to her workplace concerns.  Deere argues this relationship calls into question the subjective unwelcomeness of Foster's conduct the previous day.   Deere also notes that Hayes' complaints about Foster ended after she broke off her relationship with him and on May 28, 2020, she told Marquart they were "both over the sexual encounter."   With regard to Hayes' later complaints about Foster and "his boys," Deere argues these constitute rudeness at most and do not amount to a hostile work environment.  Deere engaged an outside investigator who investigated and issued a report finding the allegations were unsubstantiated.[18]

As noted above, a hostile work environment claim includes the following elements: (1) that the plaintiff belonged to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on sex; (4) that it affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take proper remedial action.  *Boyle*, 710 N.W.2d at 746.  Viewing the evidence in the light most favorable to Deere, I find that there are genuine issues of material fact such that Hayes is not entitled to judgment as a

---

[18] This is the subject of Hayes' motion for sanctions.

matter of law.  First, there are disputed facts concerning the extent of the conduct at issue.  While I have determined that a jury could find the May 12, 2020, incident alone could amount to severe and pervasive conduct that affected a term, condition or privilege of employment, Deere has also cited evidence from which a reasonable jury could conclude the opposite or that it was not subjectively unwelcome based on the subsequent sexual encounter between Hayes and Foster.  Second, as highlighted by the parties' arguments, there are significant credibility issues that cannot be resolved on summary judgment.  Hayes has not demonstrated that there is no genuine issue of material fact or that she is entitled to judgment as a matter of law on this claim.  As such, her motion for summary judgment on Count III is denied.

## C.    *Motion for Sanctions*

Hayes seeks sanctions based on an untimely discovery disclosure by Deere.  Hayes filed her lawsuit on October 7, 2021.  On January 27, 2022, Hayes served her first Requests for Production of Documents, which included the following requests:

> REQUEST NO. 3. Any and all documents (including internal documents such as memorandum, e-mail, correspondence, notes, etc.) regarding or relating to Plaintiff between 1/1/2020 and present.

> REQUEST NO. 7. Any and all documents (including internal documents such as memorandum, e-mail, correspondence, notes, etc.) regarding or relating to Plaintiff's 5/26/2020 ethics hotline complaint.

> REQUEST NO. 8. Any and all written or oral statements obtained by Defendant relating to Plaintiff's resignation.

Doc. 60-3.  Hayes also served interrogatories including:

> INTERROGATORY NO. 2: Please identify by full name, address and telephone number, all persons known to you, your attorneys or agents, who have any knowledge of the facts and circumstances surrounding the allegations in Plaintiff's Petition or Defendant's Answer, or any and all other matters and things which are in any way relevant or material to any of the controverted issues herein, and as to each such person set for the following information.

30

Doc. 60-4.  After receiving Deere's responses, Hayes conducted depositions and served additional Requests for Production of Documents on Deere.  Pursuant to the court's order (Doc. 29) regarding trial scheduling and discovery deadlines, all discovery in this matter was to be completed by December 12, 2022.

Hayes filed her motion for summary judgment on January 12, 2023.  On February 8, 2023, the day before filing its resistance to Hayes' summary judgment motion, Deere disclosed a 22-page Investigation Report as "supplemental documents responsive to Plaintiff's discovery requests" and identified attorney Judith Hermann as the author of the report.  Hayes argues Deere's resistance, which relies on the Investigation Report should be stricken from the docket and Deere should be ordered to pay attorney fees associated with Hayes' reply to Deere's Statement of Additional Facts, along with this motion and supporting documents.

Deere asserts that it produced the Investigation Report in response to Hayes' "unanticipated and unsupported" claim in her motion for summary judgment that Deere's investigation was fabricated.  It asserts that there is time to conduct any additional discovery in response to the disclosure before trial.  Deere notes that Hayes' assertion that any workplace investigation Deere conducted in 2020 was "fabricated" relies entirely on a misinterpretation of Hayes' own expert's report.  Deere states this does not mean that an investigation did not occur, but that Hayes' expert was not able to review the investigation documents.  Deere explains that after receiving Hayes' letter of resignation on July 22, 2020, Deere hired Hermann to conduct an attorney-client privileged investigation into Hayes' allegations.  Deere states it withheld the investigation materials as attorney-client privileged communication and attorney work product, but alerted Hayes on multiple occasions that the investigation had occurred.[19]  Deere contends it had no

_____

[19] Deere references its April 15, 2022, response to Hayes' Request for Production of Documents No. 9, seeking information regarding statements associated with Hayes' workers' compensation

(Footnote continued . . .

intent to rely on the investigation file during summary judgment proceedings until Hayes claimed that its investigation was fabricated, at which point it was compelled to waive the privilege and produce the Investigation Report. Based on these circumstances, Deere claims Hayes knew of the Investigation Report, that Deere considered it privileged and that Deere's waiver of the privilege and disclosure of the Investigation Report in response to Hayes' motion for summary judgment was justified and does not warrant sanctions.

Federal Rule of Civil Procedure 37(c)(1) provides:

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A)   may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B)   may inform the jury of the party's failure; and

(C)   may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1). The "substantially justified" standard is met if "there is a 'genuine dispute,' . . . or 'if reasonable people could differ as to [the appropriateness of the contested action.]'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citations omitted). Relevant factors to consider include: (1) the importance of the excluded material; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the material to be used at trial or on a motion; and (4) the availability of a continuance to cure such

---

claim in which it stated: "Defendant objects to this request because it seeks documents protected by the attorney-client privilege and work-product doctrine from an investigation conducted by outside counsel." Doc. 61-1. It also references Dunn's deposition in which he testified he understood "counsel would organize the information and . . . draft the letter based upon the investigation." Doc. 61-2.

prejudice. *Bruhn Farms Joint Venture v. Fireman's Fund Ins. Co.*, No. 13-CV-4106-CJW, 2017 WL 632105, at *5 (N.D. Iowa Feb. 13, 2017).

Hayes argues that these factors weigh in favor of sanctions. She notes that if the Investigation Report was "important and necessary to find the truth of this matter," as Deere contends, it should have been disclosed by the discovery deadline. With regard to Deere's explanation and contention that Hayes was aware of the existence of an investigation, Hayes notes that when deposing Dunn as to the contents of the September 16, 2020, letter concerning an investigation, counsel directed Dunn not to answer based on attorney-client privilege. Deere's other disclosed witnesses all testified they were never spoken to regarding Hayes' complaints until after the issuance of the September 16, 2020, letter.

Hayes states she was not alerted to the existence of the Investigation Report completed by Hermann until February 10, 2023. She asserts the prejudice is not easily remedied because she has already conducted depositions and her expert has relied on said depositions and documents exchanged in discovery in composing her report. She contends she would need to schedule four new depositions of newly-disclosed individuals associated with the report, along with reconducting the seven depositions and resubmitting the evidence to her expert who has already written two reports based on nearly a year's worth of extensive discovery.

After review of the parties' briefs and supporting documents, I agree with the parties that the Investigation Report was important. As to Deere's explanation, I find it is not substantially justified for several reasons. First, if Deere believed the Investigation Report was protected by the attorney-client or attorney work product privilege, there is a procedure for advising opposing counsel of that issue. Deere should have disclosed the existence of the investigation and the Investigation Report and indicated the basis of the privilege as provided in Federal Rule of Civil Procedure 26(b)(5)(A):

(A) *Information Withheld*. When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:

> (i) expressly make the claim; and

> (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

Fed. R. Civ. P. 26(b)(5)(A). This procedure clearly did not happen.

Second, Deere did not first learn of Hayes' theory at the time of her motion for summary judgment. Hayes' preliminary expert report, disclosed on June 14, 2022, states:

> 4. As detailed above, the investigation in the present case was badly flawed, to the point that the core complaint itself was not investigated. The investigator was untrained, the documentation inadequate and no follow up investigation was undertaken following receipt of Ms. Hayes resignation letter.

> 5. There was apparently an additional investigation undertaken at some point before Mr. Dunne's [sic] letter but absolutely no information about that investigation has been produced.

Doc. 49-4 at 72-73. These statements provided fair notice that Hayes would be challenging Deere's investigation (or lack thereof) at trial, or in a pretrial motion, based on her expert's conclusions. A supplement to that expert report, disclosed on December 12, 2022, states:

> My original report contained a thorough critique of Deere's handling of Ms. Hayes' complaint which need not be repeated here. Suffice it to say that I have seen nothing since that time that casts a better light on these procedures; rather, evidence indicates that they were more profoundly flawed even than they first appeared.

> Page 21 of my original report stated; "Following Ms. Hayes application for workers compensation, however, there evidently was an

34

investigation, the outcome of which was a letter from a Mr. David Dunn from the Safety Office denying her claim on the basis of his assertion that he had interviewed everyone on second shift and found no support for her claim. There is absolutely no information about this investigation in the case file: who did it, what their qualifications were, who was present, what questions were asked." <u>The reason for this is now clear; no such investigation was ever conducted</u>.

On September 16, 2020, Mr. Dunn signed a letter to Ms. Hayes denying liability for her workman's compensation claim, stating in part: "We have conducted an investigation and interviewed all employees in your department on the second shift. The investigation has determined that you were treated fairly, not discriminated against or harassed nor sexually touched or harassed, nor were any unwanted sexual advances made." (Dunn deposition, Exhibit 1). Questioned about this letter, Mr. Dunn testified that although he signed the letter, he did not write it, he did not type it, he did not discuss or question it, he had no independent knowledge of any investigation, nor was he familiar with any of the employees on second shift. Absent evidence to the contrary, it seems plausible that the idea of the investigation and its conclusions is a fabrication, thus undercutting further Deere's claims to have investigated Ms. Hayes' allegations.

Doc. 49-4 at 75 (emphasis in original). In her Summary and Conclusion, the expert stated:

As stated in my original report, the investigation in the present case was badly flawed, to the point that the core complaint itself was not investigated. The investigator was untrained, the documentation inadequate and no follow up investigation was undertaken following receipt of Ms. Hayes resignation letter.

The facts outlined in Mr. Dunn's letter of 9/26/20 stating that "we have conducted an investigation and interviewed all employees" in the melt department is not supported by the evidence. It appears that Mr. Dunn neither conducted an investigation nor wrote the letter purporting that he did so; there is no direct evidence of either its author or its basis. Four months after Ms. Hayes' complaint, there had been no meaningful investigation.

*Id.* at 75-76. Based on the explicit language of these reports, Hayes' summary judgment argument was not "unanticipated and unsupported." Much less explicit is Deere's

35

reference to this investigation in one of its discovery responses and during Dunn's deposition, particularly in light of a rule obligating Deere to disclose this investigation and the Investigation Report in a privilege log. Deere, while represented by experienced attorneys, violated Rule 26(b)(5)(A). This violation prejudiced Hayes in conducting full discovery of her claims and therefore warrants an appropriate sanction.

I did not rely on the Investigation Report in ruling on Hayes' motion for partial summary judgment, as there is a fact issue as to whether the alleged conduct was sufficiently severe and pervasive to affect a term, condition or privilege of employment. As such, simply striking it from the docket is not an effective sanction. Hayes' other proposed sanction – an award of attorney fees for preparing the reply to Deere's statement of additional facts (Doc. 56-1) along with the instant motion (Doc. 60) for sanctions – is reasonable and appropriate. Deere failed to comply with Rule 26(b)(5)(A) to disclose the existence of withheld, allegedly-privileged information, which prejudiced Hayes in conducting full discovery of her claims.

## VI. CONCLUSION

For the reasons stated herein:

1.    Deere's motion (Doc. 37) for summary judgment is **granted in part and denied in part**. It is **granted** as to Counts I and II. It is **denied** as to Counts III and IV.

2.    Hayes' motion (Doc. 39) for summary judgment on Count III is **denied**.

3.    Hayes' motion (Doc. 60) for sanctions is **granted** with respect to her request for attorney fees incurred in preparing a reply to Deere's statement of additional facts in addition to the motion for sanctions. If Hayes intends to pursue an award of attorney fees, she shall file, within **twenty-one (21) days** of the date of this order, an itemized statement and other supporting evidence reflecting the reasonable attorney fees and expenses she incurred in the preparation of those filings. Deere may file a response within **fourteen (14) days** after Hayes files those materials and Hayes may file a reply within **ten (10) days** after Deere files its response.

36

4.     Trial will proceed as scheduled beginning **June 12, 2023**, as to Counts III and IV only.

**IT IS SO ORDERED.**

**DATED** this 24th day of April, 2023.

_____
Leonard T. Strand, Chief Judge